IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JAN - 7 2013

LISA MICHELLE SAUNDERS,    )
    Plaintiff,    )
    )
v.    )    CIVIL NO. 3:12cv548-JRS
    )
MICHAEL J. ASTRUE,    )
Commissioner of Social Security,    )
    Defendant.    )
_____)

## REPORT AND RECOMMENDATION

Lisa Michelle Saunders ("Plaintiff") is 45 years old and previously worked as a bank

teller, sales associate and cashier. On August 25, 2009, Plaintiff applied for Social Security

Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the

"Act"), claiming disability due to pain in her right knee and back as well as depression with an

alleged onset date of January 9, 2006. Plaintiff's claim was presented to an ALJ, who denied

Plaintiff's requests for benefits. The Appeals Council subsequently denied Plaintiff's request for

review on May 22, 2012. Plaintiff now challenges the ALJ's decision, claiming that she suffers

from lower back, shoulder and right knee pain, arthritis, headaches, obesity and depression.[1]

(Pl.'s Mem. of Points and Author. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 1-2.) She

complains that the Commissioner never sent her for a medical consultation and that an

---

[1] Because Plaintiff proceeds *pro se*, the Court endeavors to liberally construe Plaintiff's arguments. *Erikson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed.") (citations and internal quotation marks omitted); *Pearn v. Astrue*, No. 3:10cv427, 2011 WL 3236064, at *4 (E.D. Va. April 7, 2011) (construing a disability claimant's general challenge to the ALJ's decision as a challenge to the ALJ's RFC determination and step five denial of benefits).

"associate" testified that Plaintiff "would not be able to work and keep a job with [her] physical and mental disability." (Pl.'s Mem. at 2.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[2] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 11) be DENIED; that Defendant's motion for summary judgment (ECF No. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges the ALJ's decision; as such, her education and work history, physical and mental medical histories, medical opinions, reported activities of daily living and the hearing testimony are summarized below.

### A. Plaintiff's Education and Work History

Plaintiff obtained a GED. (R. at 28.) She had taken classes at a community college, but she earned poor grades. (R. at 49.) Plaintiff testified that she performed poorly in her classes, because she could not concentrate. (R. at 49.) She was a bank teller from 2000 through 2006,

---

[2] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

but was let go, because she missed so much work. (R. at 42-43.) Plaintiff also worked at JC Penney as a sales associate and cashier for nine years. (R. at 43.)

## B.    Plaintiff's Physical Medical Records

On May 12, 2009, Plaintiff visited Rodney H. Cowans, M.D., for a follow-up visit requesting medication refills and complaining of severe migraines and right knee pain. (R. at 325.) Dr. Cowans diagnosed Plaintiff with depression and documented a normal examination. (R. at 325.) Plaintiff did not return to her scheduled visit in July 2009. (R. at 320.) However, in August 2009, she returned to Dr. Cowans, complaining of swollen feet and lower back pain. (R. at 318-19.) Dr. Cowans diagnosed Plaintiff with depression and documented a normal examination. (R. at 318.)

An x-ray of Plaintiff's lumbar spine dated September 30, 2009, revealed mild thorocolumbar scoliosis. (R. at 502.) She was prescribed medication and physical therapy. (R. at 497.) On March 5, 2010, Plaintiff returned to Dr. Cowans with a normal examination. (R. at 475.) On April 19, 2010, an x-ray of Plaintiff's shoulder revealed mild osteoarthritis and a physical examination documented near full forward flexion activity and 5/5 strength. (R. at 499, 501.) Plaintiff declined an injection and was recommended physical therapy. (R. at 500.)

In July 2010, Plaintiff visited Dr. Cowans for a refill of medications. (R. at 541.) Dr. Cowans assessed Plaintiff with dysuria[3] and otitis media not otherwise specified[4] on February 9, 2011. (R. at 525.) On April 26, 2011, Plaintiff visited William K. Fleming, M.D., complaining

---

[3] Dysuria is painful urination. *Dorland's Illustrated Medical Dictionary* 585 (32d ed. 2012).

[4] Otis media pertains to the inflammation of the ear. Id. at 1350-51.

of right knee pain. (R. at 570.) She had a good range of motion and other joint pains. (R. at 570.) An x-ray of her right knee revealed early osteoarthritis. (R. at 570.)

Plaintiff was evaluated for physical therapy on May 23, 2011. (R. at 577-79.) She described her knee pain as sharp, throbbing and shooting, and rated it as an eight to 10 out of 10. (R. at 577.) Plaintiff's hip flexion was documented at a 4/5 on her left side and a 5/5 on her right side. (R. at 578.) Her knee flexion was 4/5 and her knee was positive for patella compression. (R. at 578.) She did not require the use of an assistive device. (R. at 578.) One month later, Plaintiff rated her pain at a six out of 10. (R. at 574.) Her right knee flexion was documented at a 5/5 and extension observed to be 5-/5. (R. at 574.)

On July 14, 2011, Plaintiff visited Dr. Fleming complaining of an aching pain in her right knee and refusing an injection. (R. at 569.) He ordered an MRI of her knee and noted a good range of motion. (R. at 569.) One month later, Dr. Fleming documented that the MRI revealed "some shallowness of the trochlea and some other malalignment problems." (R. at 568, 571.) He noted that Plaintiff had fallen, her knee was "giving out" and recommended physical therapy and weight loss. (R. at 568.)

## C.    Plaintiff's Mental Medical Records

On March 15, 2009, Plaintiff visited Linda Odgen, LCSW, and complained of feeling depression, having little interest, low energy, trouble sleeping, feeling bad about herself, trouble concentrating, irritability, impulsiveness, hopelessness, low self-esteem, being sad and pain. (R. at 329-30.) Plaintiff reported that she learned from a physician recommended by her attorney that she should have knee surgery. (R. at 329.) She also discussed her family life. (R. at 329.) Her GAF was estimated at a 55-60. (R. at 330.)

4

One month later, Plaintiff returned to Ms. Odgen, feeling depressed and having trouble sleeping, trouble concentrating, low energy and low self-esteem. (R. at 327.) Ms. Odgen suggested that Plaintiff identify household or work projects to accomplish to build self-esteem. (R. at 327.) She discussed her family problems and was assessed a GAF of 51-60. (R. at 327-28.)

In May 2009, Plaintiff complained of feeling depressed and having trouble sleeping, trouble concentrating, low energy and low self-esteem. (R. at 323.) She discussed her family problems and was assessed a GAF of 55-60. (R. at 323-24.) A few weeks later, Plaintiff's GAF was estimated at being 51-60. (R. at 321-22.) Plaintiff's main issues stemmed from her primary support group, economic problems and occupational problems. (R. at 322.) She missed her new patient psychiatric evaluation with Asha Solanksy, NP, on September 30, 2009. (R. at 317.)

On October 9, 2009, Plaintiff met with Ms. Odgen, complaining of feeling depressed and having trouble sleeping, trouble concentrating, low energy and low self-esteem. (R. at 315.) Ms. Odgen encouraged Plaintiff to use a cognitive-behavioral therapy to decrease depression and increase her coping skills. (R. at 315.) She discussed her family problems and was assessed a GAF of 51-60. (R. at 315-16.) A few weeks later, Plaintiff's GAF was increased to 55-60. (R. at 314.)

In January 2010, Plaintiff discussed her family life and how stress affected her health with Ms. Odgen. (R. at 483.) Ms. Odgen encouraged Plaintiff to set boundaries with her family and assessed her GAF at 51-60. (R. at 483-84.) In February 2010, Plaintiff complained that her family was not paying her appropriately for childcare; her GAF was still estimated at a 51-60. (R. at 481-82.) A few weeks later, Ms. Odgen documented that Plaintiff's GAF had not changed and that Plaintiff was tearful while discussing her family situation. (R. at 479-80.) On March 4,

2010, Plaintiff was being forgetful and was assessed a GAF of 51-60. (R. at 477-78.) A week later, her GAF remained the same. (R. at 473-74.) Plaintiff could not follow through with setting boundaries and was estimated to have a GAF of 51-60 on March 18, 2010. (R. at 471-72.) In April 2010, Ms. Odgen estimated that Plaintiff had a GAF of 51-60. (R. at 467-70.) On May 6, 2010, Plaintiff discussed her family problems and was assessed a GAF of 51-60. (R. at 465-66.)

In June 2010, Plaintiff discussed her daughter's incarceration and its impact on her granddaughter. (R. at 545.) Ms. Odgen focused on coping skills to alleviate stress and documented that Plaintiff was "bright during the session." (R. at 545.) She assessed Plaintiff's GAF at 51-60. (R. at 545-46.) One month later, her GAF was unchanged. (R. at 537-44.)

On August 9, 2010, Ms. Odgen documented that Plaintiff's mother lived with her, Plaintiff took care of her sister's children daily and Plaintiff enrolled in classes at community college. (R. at 535-36.) Two weeks later, Plaintiff's GAF was estimated at a 51-55, after Plaintiff appeared depressed and tearful during her session with Ms. Odgen. (R. at 533-34.) Her GAF improved to 50-60 in November 2010. (R. at 531-32.) She continued to discuss her family issues and her GAF continued to be estimated at 50-60 through December 2010. (R. at 527-28.)

On February 17, 2011, Plaintiff's GAF was estimated at a 51-60 and Plaintiff continued to discuss her family problems. (R. at 523-24.) For the next two sessions, Plaintiff was frustrated and sad and her GAF was assessed to be 51-55. (R. at 519-22.) She continued to discuss her family problems in March 2011. (R. at 515-18.) In April 2011, Plaintiff's GAF was assessed at a 51-60. (R. at 511-14.) Plaintiff was tearful or frustrated when discussing her family in July 2011 and her GAF continued to be estimated at 51-60 or 55-60. (R. at 505-10.)

**D.      The Opinions of Non-Treating State Agency Doctors**

On February 9, 2010, Alan D. Entin, Ph.D., ABPP, a non-treating state agency psychologist, opined that Plaintiff had mild restriction in her activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation. (R. at 77.) Dr. Entin's assessment was affirmed on June 21, 2010 by Leslie E. Montgomery, Ph.D., ABPP. (R. at 100-01.) On February 11, 2010, Robert Chaplin, a non-treating state agency physician, determined that there was "no evidence of severe physical impairment." (R. at 76.) Martin Cader, M.D., a non-treating state agency physician, affirmed Dr. Chaplin's assessment on June 2, 2010. (R. at 99-100.)

## E.    Plaintiff's Activities of Daily Living

Plaintiff met with a SSA representative on September 15, 2009. (R. at 195.) The representative noted that Plaintiff was "moving from one side to the other on the chair during the entire interview" and stated that she was in pain. (R. at 194.) She also was emotional during part of the interview. (R. at 194.)

Gwendolyn A. Saunders, Plaintiff's mother, completed a Third Party Function Report on September 28, 2009. (R. at 214.) Ms. Saunders indicated that Plaintiff took care of other children, tried to keep her house clean and performed basic care for her children. (R. at 215.) Occasionally, Plaintiff could not sleep due to her pain, but she could care for herself. (R. at 216.) She could prepare simple meals, performed chores and shopped. (R. at 217-19.) Ms. Saunders marked that Plaintiff was limited in lifting, standing, walking, sitting, climbing, kneeling, squatting, reaching and bending. (R. at 220.) She wrote that Plaintiff could follow instructions and got along well with superiors, but could not handle stress or change well. (R. at 221-22.) Plaintiff occasionally used a cane and wrist brace. (R. at 222.)

On October 7, 2009, Plaintiff wrote that she had constant aching, stabbing, burning and throbbing pain in her mid-lower back, right knee and leg and right waist. (R. at 235-36.) Her pain was exasperated when she stood, walked, bent, reached or twisted. (R. at 235.) If she stood or walked for long periods of time, her knee and back pain would radiate through her leg. (R. at 235.) Plaintiff indicated that ice and medication relieved her pain some. (R. at 236.)

That same day, Plaintiff completed a Function Report, writing that she took a shower, took her pain and depression medication, washed dirty clothes, sent her children to school, attempted to complete the chores not finished by her children, laid down, helped with her children's homework and watched television daily. (R. at 237-44.) She took care of her children. (R. at 238.) Plaintiff's knee and back was in pain, but she did not need any help to take care of herself. (R. at 238-39.) She cooked simple meals, laundered clothes and performed simple household chores. (R. at 239.)

Plaintiff attempted to go outside every day and could drive, but preferred shopping with a daughter or her sister because she was afraid of falling. (R. at 240.) Plaintiff enjoyed watching television, reading books, talking on the phone and visiting with family. (R. at 241.) Her illnesses limited her ability to lift, walk, climb stairs, squat, sit for long periods of time, bend, kneel, stand, reach, remember, see when she had migraines, complete tasks, concentrate, use her hands and get along with others. (R. at 242.) Plaintiff could not handle stress well. (R. at 243.) She indicated that her physical therapist gave her a wrist brace and cane. (R. at 243.)

F.     The Hearing Testimony

On September 22, 2011, Plaintiff testified before an ALJ, stating that she was single and slept on the second floor of a tri-level house with three children, two grandchildren and a

nephew. (R. at 21-28.) She obtained child support and two children received money from sources outside the home. (R. at 28.) The children cooked for themselves. (R. at 29.)

Plaintiff's knee and back hurt when she walked or stood for long periods of time. (R. at 29.) She participated in physical therapy and home exercises to strengthen her knee, which hurt constantly. (R. at 29-30.) Plaintiff rated the pain on her knee at a 10 on a scale of a one to 10, but admitted that it reduced to a five out of 10 when she applied ice. (R. at 30.) She took Ibuprofen and Wellbutrin. (R. at 30.) Plaintiff could walk one and a half city blocks, stand for 10-15 minutes at a time, sit for 20-25 minutes at a time and lift about five pounds. (R. at 32-33.) She has fallen as a result of her knee. (R. at 40.)

Plaintiff saw a therapist once a week. (R. at 35-36.) When she was depressed, Plaintiff did not want to get out of bed or interact with her family. (R. at 36-37.) She drove once a week and occasionally shopped for groceries with her daughter or attended church. (R. at 37-38.) Plaintiff attempted to keep her bathroom clean and prepared food with the microwave. (R. at 38-39.) She used a computer a few times per week. (R. at 39.)

On a typical day, Plaintiff would help her daughter get to school, feed her granddaughter, visit her physical therapist, clean her bathroom and fold and launder clothes. (R. at 43-46.) She testified that she could not perform a sedentary job, because she could not sit all day. (R. at 46.) Plaintiff's pain made it difficult to concentrate. (R. at 46-47.) Approximately three days per week, Plaintiff could not interact with her family and would have crying spells. (R. at 47-48.)

A vocational expert ("VE") also testified at the hearing. (R. at 49-57.) The VE noted that, in many hypothetical instances, Plaintiff would be capable of performing work. (*See* R. at 50-56.) However, if Plaintiff would be required to miss two or more days of work a month,

would require more than normal breaks during the workday or could not stay focused for 80% of the workday, she would not be capable of performing work. (*See* R. at 56-57.)

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on August 25, 2009, claiming disability due to pain in her right knee and back as well as depression with an alleged onset date of January 9, 2006. (R. at 73.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[5] (R. at 119-24, 129-31.) On September 22, 2011, Plaintiff testified at a hearing before an ALJ. (R. at 21-59.) On October 28, 2011, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 9-19.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on May 22, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 1-3.)

## III. QUESTION PRESENTED

Was the Commissioner's decision that Plaintiff was not disabled under the Act supported by substantial evidence on the record and the application of the correct legal standard?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650,

---

[5] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[6] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[7] based on an assessment of

---

[6] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[7] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

the claimant's residual functional capacity ("RFC")[8] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the

---

[8] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

On October 28, 2011, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since January 9, 2009, her alleged onset date. (R. at 9-19.) At step two, the ALJ determined that Plaintiff was severely impaired from obesity, bursitis of the left shoulder, osteoarthritis of the right knee and depression. (R. at 12.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 12-14.)

The ALJ then determined that Plaintiff had the RFC to perform light work, except that she:

> should never climb ropes, ladders or scaffolding. She could occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl. Due to her impairments, combined with the [e]ffects of the pain medications and depression, she must avoid hazards, or hazardous machinery, [and] unprotected heights. She would be capable of unskilled jobs, using the phrases that are commonly understood, jobs that involve simple routine tasks, short simple instructions, work that needs little or no judgment to do simple duties that can be learned on the job in a short timeframe [—] only simple work-related decisions with few workplace changes. She should have no more than occasional level direct face-to-face interaction with the general public, no more than occasional level direct face-to-face interaction with coworkers on the completion of an assigned task or duty, but this would not preclude routine daily on the job site direct face-to-face interaction with coworkers.

(R. at 14.) The ALJ summarized Plaintiff's statements, which reported that Plaintiff lived with her children, grandchildren and nephew, whose ages included a newborn, a toddler and 26-year old. (R. at 15.) Plaintiff's children cooked for themselves. (R. at 15.) When she stood or walked for long periods of time, Plaintiff's back and knee hurt. (R. at 15.) She went to physical

therapy, exercised at home and rated her pain at a five on a scale out of one to 10 after she iced her knee. (R. at 15.)

Plaintiff believed that she could walk for a block and a half, sit for 20 minutes, stand for 10 to 15 minutes and lift five pounds with her right hand. (R. at 15.) Plaintiff's depression isolated her and made her unmotivated. (R. at 15.) She drove once a week, occasionally went to church, attempted to keep her bathroom clean and did not launder her clothes. (R. at 15.) Plaintiff prepared her meals using a microwave and used a laptop a few times per week. (R. at 15.) She cried three times a week. (R. at 15.) The ALJ determined that Plaintiff's statements were not fully credible. (R. at 16.)

The ALJ then summarized Plaintiff's medical records, which included documentation of severe migraine headaches, right knee pain, obesity and depression. (R. at 16.) She told medical providers that she babysat her sister's and daughter's children. (R. at 16.) Plaintiff was generally bright during therapy, learning coping skills and working on setting boundaries. (R. at 16.) She enrolled in classes at a community college. (R. at 16.) Her GAF was rated between a 51 and 60. (R. at 16.)

Patient notes also documented a normal range of motion with no swelling or redness. (R. at 17.) Although Plaintiff indicated that she generally stayed at home, medical records noted that Plaintiff regularly visited her daughter in jail, regularly attended physical therapy and was not willing to receive injections for her knee or shoulder pain. (R. at 17.)

The ALJ gave the non-treating state agency doctors' opinions "great weight as they [were] consistent with the medical records contained in the file." (R. at 17-18.) The GAFs assigned to Plaintiff by licensed clinical social workers were "not supported by the longitudinal

or other evidence" and "flatly contradict[ed] the abilities and activities that the claimant was able to perform." (R. at 18.)

At step four, the ALJ assessed that Plaintiff was unable to perform her past work as a cashier, sales clerk and teller. (R. at 18.) Based on Plaintiff's age, education, work experience and RFC, the ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 18-19.) The ALJ therefore found that Plaintiff had not been under a disability under the Act from January 9, 2006. (R. at 19.)

Plaintiff challenges the ALJ's decision and complains that the Commissioner never sent her for a medical consultation and that an "associate" testified that Plaintiff "would not be able to work and keep a job with [her] physical and mental disability." (Pl.'s Mem. at 1-2.) Defendant asserts that substantial evidence supported the ALJ's decision. (Def.'s Mot. for Summ. J. and Brief in Supp. Thereof ("Def.'s Mem.") at 17-22.)

## A.    The Commissioner did not err when determining Plaintiff's RFC.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must

consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

In his decision, the ALJ then determined that Plaintiff had the RFC to perform light work, except that she:

> should never climb ropes, ladders or scaffolding. She could occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl. Due to her impairments, combined with the [e]ffects of the pain medications and depression, she must avoid hazards, or hazardous machinery, [and] unprotected heights. She would be capable of unskilled jobs, using the phrases that are commonly understood, jobs that involve simple routine tasks, short simple instructions, work that needs little or no judgment to do simple duties that can be learned on the job in a short timeframe [—] only simple work-related decisions with few workplace changes. She should have no more than occasional level direct face-to-face interaction with the general public, no more than occasional level direct face-to-face interaction with coworkers on the completion of an assigned task or duty, but this would not preclude routine daily on the job site direct face-to-face interaction with coworkers.

(R. at 14.) In doing so, the ALJ determined that Plaintiff's statements were not fully credible. (R. at 16.) He also assessed that the GAFs assigned to Plaintiff by licensed clinical social workers were "not supported by the longitudinal or other evidence" and "flatly contradict[ed] the abilities and activities that the claimant was able to perform." (R. at 18.)

Plaintiff lived in a house with three children, two grandchildren and a nephew. (R. at 21-28.) On a typical day, Plaintiff would help her daughter get to school, feed her granddaughter, visit her physical therapist, clean her bathroom and fold and launder clothes. (R. at 43-46.) Plaintiff could walk one and a half city blocks, stand for 10-15 minutes at a time, sit for 20-25 minutes at a time and lift about five pounds. (R. at 32-33.) Plaintiff's GAF was regularly assessed at 51-60. (*See* R. at 327-28.)

Regardless of these alleged limitations, Plaintiff took care of her children along with her sister's children and her grandchildren every day. (See R. at 43-46, 535-36.) Some of these children were under the age of three. (*See* R. at 15.) She also enrolled in classes at a community college. (R. at 535-36.) Plaintiff's abilities and responsibilities greatly reduced the credibility of her allegations of limitations.

Additionally, Plaintiff indicated at the hearing that her physical therapist gave her a wrist brace and cane. (R. at 243.) However, her physical therapist noted that she did not require the use of an assistive device. (R. at 578.) Contradictory statements such as these supported the ALJ's determination that Plaintiff was less than fully credible.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Because substantial evidence supported his decision, the ALJ did not err in determining Plaintiff's RFC.

**B.      The Commissioner was not required to send Plaintiff to a consultative examiner.**

Plaintiff asserts that no effort was made to send her for a conductive exam. (*See* Pl.'s Mem. at 2.) While the Commissioner has the duty to develop the record, he is not required to act as Plaintiff's counsel. *See Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994) ("[T]he ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record."); *see also Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. 1995) (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). Plaintiff was represented at the hearing (*see* R. at 23) and therefore had adequate representation and ability to develop the record.

**C.      The ALJ adequately adopted the VE's testimony to determine Plaintiff's RFC.**

Next, at the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner can carry his burden in the final step with the testimony of a VE. As noted earlier, when a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

Because the ALJ did not err in his evaluation of the medical opinion evidence and Plaintiff's credibility, the ALJ presented the VE with a hypothetical that adequately described Plaintiff's mental limitations, which was then adopted by the ALJ as Plaintiff's RFC. (*See* R. at 14, 50-56.) While Plaintiff asserts that a SSA "associate" testified that Plaintiff was not capable of performing jobs in the national economy, that statement occurred after the VE was asked a hypothetical by the ALJ that was not adopted in the ALJ's decision. (*See* R. at 56-57.)

As discussed above, substantial evidence supported the ALJ's decision that Plaintiff was not disabled. The ALJ did not err when he evaluated Plaintiff's credibility and adopted the hypothetical that he presented to the VE as Plaintiff's RFC. Consequently, the Court recommends that the Commissioner's decision be affirmed.

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 11) be DENIED; that Defendant's motion for summary judgment (ECF No. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to Plaintiff and all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure

shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated:__January 4, 2013__